IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Isak Vazquez-Santiago           :
                                    : No. 453 C.D. 2020
            v.                      :
                                    : Argued: October 20, 2021
Commonwealth of Pennsylvania,   :
Department of Transportation,     :
Bureau of Driver Licensing,        :
               Appellant        :

BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge[1]
                 HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE J. ANDREW CROMPTON, Judge[2]

OPINION
BY JUDGE McCULLOUGH                     FILED: January 4, 2022

The Department of Transportation, Bureau of Driver Licensing (Bureau) appeals from the April 6, 2020 order of the Court of Common Pleas of Dauphin County (trial court), which sustained Isak Vazquez-Santiago's (Licensee) appeal of the suspension of his driving privileges. In this case, Licensee was stopped and was arrested on suspicion of driving under the influence of alcohol (DUI). He was asked to submit to a blood test to determine his blood alcohol concentration, and he allegedly

---

[1] The Court reached the decision in this case prior to the conclusion of President Judge Emeritus Brobson's service on the Commonwealth Court.

[2] The Court reached the decision in this case prior to the conclusion of Judge Crompton's service on the Commonwealth Court.

refused, resulting in the suspension of his operating privilege under section 1547(b)(1)(i) of the Vehicle Code, 75 Pa.C.S. §1547(b)(1)(i),[3] commonly referred to as the "Implied Consent Law."  The question presented in this appeal is whether Licensee's lack of understanding of the English language prevented him from making a knowing and conscious refusal of a chemical blood test because he could not understand the consequences of a refusal.  Because we so conclude, we affirm the trial court's order.

## Background

As related by the trial court, the pertinent facts are as follows.  On June 24, 2019, at approximately 1:58 a.m., Harrisburg City Police Officer Carson O'Connor was on patrol in the area of Second and Maclay Streets in the City of Harrisburg.  (Trial Ct. Op. at 2.)  He observed a Toyota sedan cross a double yellow line, make a righthand turn without signaling, drive across the center lane, and veer into another lane without signaling.  *Id*.  Following these observations, Officer O'Connor initiated a traffic stop.  Officer O'Connor approached the driver, who later was identified as Licensee.

Licensee is Spanish-speaking, and Officer O'Connor does not speak Spanish.  Thus, throughout their interaction, Licensee was unable to understand many of Officer O'Connor's questions and directions.  Officer O'Connor asked Licensee to

---

[3] Section 1547(b)(1)(i) of the Vehicle Code provides, in relevant part, as follows:

(1) If any person placed under arrest for a violation of section 3802 [relating to driving under influence of alcohol or controlled substance] is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person as follows:

(i) Except as set forth in subparagraph (ii), for a period of 12 months.

75 Pa.C.S. §1547(b)(1)(i).

lower his window, but because Licensee had difficulty doing so, he opened the driver's-side car door instead. *Id.* When Licensee opened the door, Officer O'Connor detected an odor of alcohol emanating from the vehicle, and observed that Licensee's eyes were glazed and bloodshot. *Id.* Officer O'Connor then closed the door and, using a combination of verbal commands and hand signals, requested that Licensee roll down his window. *Id.* at 2-3. Licensee eventually understood Officer O'Connor's request, rolled down the window, and provided Officer O'Connor with his driver's license and vehicle registration. *Id.* at 3.

Officer O'Connor returned to his patrol car to check for outstanding warrants and to wait for additional officers to arrive. *Id.* When he returned to Licensee's vehicle, he observed that Licensee was asleep in the driver's seat. *Id.* Officer O'Connor roused Licensee and asked him how much he had had to drink that night. *Id.* Licensee was unable to understand the officer's inquiry spoken in English, so Officer O'Connor used hand signals to communicate the question. *Id.* Ultimately, Licensee appeared to understand the inquiry and indicated that he had consumed three alcoholic beverages. *Id.* At Officer O'Connor's request, Licensee stepped out of the vehicle, and Officer O'Connor detected a strong odor of alcohol coming from Licensee's person. *Id.* Officer O'Connor attempted to conduct a field sobriety test, but Licensee was unable to understand the officer's directions, so no sobriety tests were performed. *Id.* Based upon his observations, Officer O'Connor placed Licensee under arrest on suspicion of DUI.

Due to their language barrier, Officer O'Connor placed a police radio call requesting the assistance of any available Spanish-speaking officer to assist him, but he was unable to locate such an officer. *Id.* at 3-4. Officer O'Connor then drove Licensee to the Dauphin County Booking Center, where he requested that Licensee

submit to a chemical test of his blood. *Id.* at 4. To explain his request, Officer O'Connor had to use various hand signals, such as pointing to his arm. *Id.* Based on these hand signals, it appeared to Officer O'Connor that Licensee understood that the officer was asking him to undergo a blood draw. *Id.* Officer O'Connor proceeded to read to Licensee, in English, the warnings required by the Implied Consent Law[4] and our Supreme Court's decision in *Department of Transportation, Bureau of Traffic Safety v. O'Connell*, 555 A.2d 873 (Pa. 1989) (*O'Connell* warnings),[5] which are listed on the Department of Transportation DL-26B Form.[6] Officer O'Connor read the DL-

---

[4] Section 1547(b)(2)(i) of the Vehicle Code provides:

(2) It shall be the duty of the police officer to inform the person [under arrest for DUI] that:

(i) the person's operating privilege will be suspended upon refusal to submit to chemical testing and the person will be subject to a restoration fee of up to $2000 . . . .

75 Pa.C.S. §1547(b)(2)(i).

[5] In *O'Connell*, our Supreme Court held that, when a motorist is asked to submit to chemical testing under the Implied Consent Law, the law enforcement officer making the request has a duty to explain to the motorist that the rights provided by the United States Supreme Court decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), are inapplicable to a request for chemical testing. *O'Connell*, 555 A.2d at 878.

[6] As this Court has noted previously, the DL-26B Form contains the following warnings:

1. You are under arrest for driving under the influence of alcohol or a controlled substance in violation of Section 3802 of the Vehicle Code.

2. I am requesting that you submit to a chemical test of blood.

3. If you refuse to submit to the blood test, your operating privilege will be suspended for at least 12 months. If you previously refused a chemical test or were previously convicted of driving under the influence, you will be suspended for up to 18 months.

**(Footnote continued on next page…)**

4

26B Form exactly as it was printed in English, and he used no visual aids or hand signals, as he had during earlier attempts to communicate with Licensee. *Id.* As the trial court stated, Officer O'Connor's "reading of the DL-26B form *in English* is the gravamen of this case." *Id.* (emphasis in original).

After reading the form to Licensee, Officer O'Connor asked Licensee whether he would submit to a blood test, and Licensee answered "No." *Id.* Licensee also refused to sign the portion of the form that asks the motorist to acknowledge that he had been advised of the warnings contained thereon. *Id.* at 4-5. Officer O'Connor construed Licensee's conduct as a refusal to submit to testing. However, at the hearing on Licensee's appeal, Officer O'Connor acknowledged that he was unsure as to whether Licensee understood what was being asked of him, and he was uncertain as to whether Licensee understood the *consequences* of his refusal to take the test. *Id.* at 5. The trial court emphasized the following exchange between Officer O'Connor and Licensee's counsel:

> [Licensee's] Counsel: You're stating that you believe [Licensee] understood that he was refusing the test?
>
> Officer O'Connor: Correct.
>
> [Licensee's] Counsel: *Are you certain that he understood his license would be suspended if he didn't take the test?*
>
> Officer O'Connor: *I wouldn't be able to answer that. I don't know.*

---

4. You have no right to speak with an attorney or anyone else before deciding whether to submit to testing. If you request to speak with an attorney or anyone else after being provided these warnings or you remain silent when asked to submit to a blood test, you will have refused the test.

*Garlick v. Department of Transportation, Bureau of Driver Licensing*, 176 A.3d 1030, 1034 (Pa. Cmwlth. 2018) (*en banc*).

*Id.* at 5-6 (quoting Notes of Testimony, 11/25/2019 (N.T.), at 17) (emphasis in original).

Licensee testified on his own behalf at the hearing. He testified entirely in Spanish with the assistance of an interpreter. *Id.* at 6 n.2. Licensee explained that he is from Puerto Rico, does not speak English, and has only lived in the mainland United States for two-and-a-half years. *Id.* at 6. Licensee was employed at a warehouse, where he received all of his work-related instructions in Spanish. *Id.* With regard to the incident giving rise to the appeal, Licensee acknowledged that he was intoxicated at the time that Officer O'Connor arrested him. *Id.* However, Licensee did not recall being asked to submit to a blood test, and he did not recall Officer O'Connor warning him that his driver's license would be suspended. *Id.* Licensee testified that he did not provide a blood sample to Officer O'Connor because he did not know what the officer was saying to him. *Id.*

Ultimately, the trial court held that Licensee could not have made a knowing and conscious refusal because he was unable to understand Officer O'Connor's warning regarding the consequences of refusing to submit to a blood test. *Id.* at 14. The trial court noted that this Court has held that in some circumstances, a language barrier may affect a driver's ability to make a knowing and conscious refusal. *Id*. at 8. Citing *Im v. Department of Transportation*, 529 A.2d 94 (Pa. Cmwlth. 1987), the trial court explained that this Court concluded that a native Korean failed to establish his refusal was not knowing or conscious because he responded to all of the officer's questions in English without the assistance of an interpreter. (Trial Ct. Op. at 9.) The trial court also highlighted *Balthazar v. Department of Transportation, Bureau of Driver Licensing*, 553 A.2d 1053 (Pa. Cmwlth. 1989), in which this Court held that a native Spanish speaker did not meet his burden of establishing that his refusal was

6

not knowing or conscious where the record established that he testified extensively at the hearing without the assistance of an interpreter, and where a nurse communicated with him in Spanish before his refusal. (Trial Ct. Op. at 9.) Finally, the trial court cited *Martinovic v. Department of Transportation, Bureau of Driver Licensing*, 881 A.2d 30 (Pa. Cmwlth. 2005), explaining that we held that a Serbo-Croatian speaker did not meet his burden to show that his refusal was not knowing or conscious because he attempted to submit to a breath test multiple times. (Trial Ct. Op. at 9.)

The trial court found the instant matter most analogous to this Court's decision in *Department of Transportation, Bureau of Motor Vehicles v. Yi*, 562 A.2d 1008 (Pa. Cmwlth. 1989). In that case, the trial court observed, this Court held that substantial evidence supported the lower court's conclusion that the licensee's inability to understand English precluded him from making a knowing and conscious refusal where the licensee testified through an interpreter that he did not understand English, did not understand the ramifications of his refusal, never answered a question without the help of an interpreter, and the arresting officers testified that they were uncertain whether the licensee understood them. Likewise, here, the trial court reasoned that Licensee's "lack of understanding of the English language is undeniable; and, here, there are no additional facts or evidence to suggest . . . that [Licensee] may have understood the *consequences* of refusal in spite of his language barrier." (Trial Ct. Op. at 11 (emphasis in original).) As in *Yi*, and in contrast with the earlier-discussed precedents, Licensee gave all his testimony in Spanish, required the assistance of an interpreter at all times, explained that he did not understand Officer O'Connor's warnings, and Officer O'Connor testified that he was uncertain whether Licensee understood him. *Id.* The trial court further emphasized that it was only when Officer O'Connor used hand signals that Licensee appeared to understand any of Officer

7

O'Connor's commands, and Licensee's language barrier was so apparent that Officer O'Connor radioed a request for assistance from a Spanish-speaking officer before transporting Licensee to the booking center for a blood draw, although no such officer was available. *Id.* at 11-12.

With respect to the DL-26B Form, the trial court stressed that Officer O'Connor read its warnings only in English and, unlike their previous attempts to communicate, did not use any hand signals to assist Licensee in understanding. *Id.* at 12. "Viewing this situation with a modicum of common sense," the trial court opined, it was certainly understandable that Officer O'Connor faced a "daunting task" of attempting to communicate the request to Licensee despite the limited resources available to him; however, it is "quite another matter to speculate that [Licensee] even remotely understood the consequences of a refusal to provide the blood sample upon [Licensee's] driver's license, where no effective communications had been established via the English language." *Id.* (emphasis omitted). Thus, because it was apparent that the language barrier between Licensee and Officer O'Connor prevented Licensee from understanding the consequences of his refusal to submit to a blood test, the trial court concluded that Licensee's refusal was not knowing and conscious. *Id.* at 13-14. Accordingly, the trial court sustained Licensee's appeal and ordered that the suspension of his driving privileges be rescinded.

The Bureau then sought this Court's review of the trial court's order.[7]

---

[7] "This Court's standard of review of a trial court's order in a license suspension matter involving a licensee's refusal to submit to chemical testing is limited to considering whether the trial court's findings are supported by [substantial] evidence and whether the court erred as a matter of law or abused its discretion." *Reed v. Department of Transportation, Bureau of Driver Licensing*, 25 A.3d 1308, 1310 n.3 (Pa. Cmwlth. 2011) (citing *Banner v. Department of Transportation, Bureau of Driver Licensing*, 737 A.2d 1203, 1205 (Pa. 1999)).

8

**Arguments**

On appeal, the Bureau raises three questions for this Court's review: (1) whether the trial court erred as a matter of law in concluding that Licensee satisfied his burden[8] of proving that he was incapable of making a knowing and conscious refusal because he did not understand English; (2) whether the trial court's finding to that effect was supported by substantial evidence; and (3) whether Licensee failed to satisfy his burden of proof that his excess consumption of alcohol did not cause or contribute to his inability to understand Officer O'Connor's instructions.

With respect to its first argument, the Bureau primarily relies upon *Martinovic* for the proposition that a language barrier does not prevent a licensee from providing a knowing and conscious refusal to submit to chemical testing. Under *Martinovic*, the Bureau argues, a police officer merely must read the Implied Consent warnings to the licensee, and it is immaterial whether the licensee understands them. (Bureau's Br. at 20-21 (discussing *Martinovic*, 881 A.2d at 35-36).) Because Officer O'Connor read the DL-26B Form to Licensee, the Bureau contends that the officer had fully satisfied his duties under the law, and under *Martinovic*, Licensee's inability to understand the warnings in English did not preclude him from making a knowing and conscious refusal to submit to a blood test. Therefore, the Bureau argues that the trial court erred as a matter of law in sustaining Licensee's appeal.

---

[8] The parties agree that the Bureau satisfied its initial evidentiary burden to establish grounds for suspension of Licensee's driver's license. *See Sitoski v. Department of Transportation, Bureau of Driver Licensing*, 11 A.3d 12, 18 (Pa. Cmwlth. 2010) (Bureau must establish that the licensee "(1) was placed under arrest for driving while under the influence of alcohol; (2) was asked to submit to a chemical test; (3) refused to do so; and (4) was specifically warned that a refusal would result in the revocation of his or her driver's license") (citing *Thoman v. Department of Transportation, Bureau of Driver Licensing*, 965 A.2d 385, 388 (Pa. Cmwlth. 2009)). Once the Bureau meets its burden, "the burden then shifts to the licensee to show that he was physically unable to take the test or that the refusal was not knowing or conscious." *Id.*

9

The Bureau's second line of argument challenges the trial court's fact-finding. Although the Bureau recognizes that whether a refusal was knowing and conscious is a question for the fact-finder, it contends that the trial court's conclusion here was not supported by substantial evidence. The Bureau criticizes the trial court's reliance upon Officer O'Connor's testimony that he was *uncertain* as to whether Licensee understood him when he provided the necessary warnings. Because the Bureau contends that there is no requirement that an officer be certain of a licensee's comprehension, it deems the trial court's reliance upon this testimony to be erroneous. *Id.* at 23-26. The Bureau further highlights Licensee's testimony that he "did not recall" Officer O'Connor warning him that his driver's license would be suspended. *Id.* at 27. According to the Bureau, this statement contradicted Licensee's contention that he did not understand Officer O'Connor's warnings, because "not recalling" is a different state of mind than "not understanding." *Id.* at 27-28. Thus, the Bureau suggests that the trial court should have rejected Licensee's testimony regarding his inability to comprehend Officer O'Connor's warnings.

Finally, the Bureau argues that Licensee failed to prove that his inability to understand Officer O'Connor's warnings was not caused by his intoxication. The Bureau cites a line of this Court's precedent holding that voluntary intoxication is not a sufficient basis for the conclusion that a refusal was not knowing and conscious. *Id.* at 29-30 (citing, *inter alia*, *Kollar v. Department of Transportation, Bureau of Driver Licensing*, 7 A.3d 336, 340 (Pa. Cmwlth. 2010) ("[I]f the motorist's inability to make a knowing and conscious refusal of testing is caused in whole or in part by consumption of alcohol, the licensee is precluded from meeting her burden as a matter of law.")). The Bureau contends that Licensee failed to offer sufficient evidence that his intoxication did not affect his ability to understand English, and it suggests that he

could have called a witness to testify as to whether he could understand English when he is sober. *Id.* at 30. Absent such evidence, the Bureau contends that the trial court's conclusion was not supported by substantial evidence, and its order must therefore be reversed.

Licensee, for his part, advances an array of reasons for affirmance of the trial court's order. First, Licensee argues that the Bureau waived all issues on appeal because it filed a defective concise statement of errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(b) (Concise Statement). Licensee argues that the Bureau's six-page Concise Statement failed to comport with almost every requirement of the Rule because it was too long, contained extraneous information, and failed to specifically identify issues raised on appeal. (Licensee's Br. at 7-9.)

With regard to the merits of the Bureau's position, Licensee argues that the trial court correctly found that he was incapable of understanding English, and that it properly determined that his refusal to submit to chemical testing consequently was not knowing and conscious. As it concerns the trial court's fact-finding, Licensee notes that he expressly testified regarding his inability to understand the warnings, and that other facts and circumstances supported this fact, including Officer O'Connor's description of the need to use hand signals to communicate with Licensee and his attempt to locate a Spanish-speaking officer to assist him. *Id.* at 11. Licensee asserts that the trial court credited both his testimony and Officer O'Connor's, that those testimonies were consistent, and that they lead inexorably to the conclusion that Licensee could not understand Officer O'Connor's warnings in English. The Bureau's effort to "cherry-pick portions of testimony to argue to the contrary," Licensee contends, is merely a challenge to the trial court's credibility determinations. *Id.* at 12.

11

Turning to this Court's precedent, Licensee counters the Bureau's reliance upon *Martinovic* by invoking *Yi*. In earlier decisions such as *Im* and *Balthazar*, Licensee notes, there were factual determinations that the licensees there were actually able to understand warnings given in English. (Licensee's Br. at 15-16 (discussing *Im*, 529 A.2d at 94-96; *Balthazar*, 553 A.2d at 1054-55).) By contrast, in *Yi*, the facts as found by the trial court demonstrated that the licensee was unable to understand warnings read to him in English, and the trial court accordingly determined that the licensee could not make a knowing and conscious refusal. *Id.* at 15-16 (discussing *Yi*, 562 A.2d at 1009). The instant case, Licensee argues, is akin to *Yi*. With regard to *Martinovic*, Licensee refers to a comment in that decision suggesting that, in "some circumstances," a language barrier "might affect a licensee's ability to make a knowing and conscious refusal." *Id.* at 17 (quoting *Martinovic*, 881 A.2d at 34-35). In any event, Licensee contends that *Martinovic* is distinguishable on its facts, and that the instant case is therefore controlled by *Yi*. *Id.* at 17-18.[9]

As an alternative basis for affirmance, Licensee argues that the Implied Consent Law is unconstitutional to the extent that it imposes the penalty of driver's license suspension upon a licensee who refuses to consent to a warrantless blood test. Licensee relies upon the line of Fourth Amendment[10] precedent developed in the

___

[9] After articulating his disagreement with the Bureau's factual and legal arguments, Licensee suggests that the Bureau's appeal is wholly frivolous, and that we should award him counsel fees under Pa.R.A.P. 2774. Licensee argues that the Bureau raises claims that have been rejected by prior case law, and that are based solely upon facts contrary to the trial court's findings of fact—both of which may constitute grounds for an award of counsel fees. (Licensee's Br. at 25-28.) Although we ultimately agree with Licensee on the merits of the instant appeal, as discussed below, there is language in *Martinovic* that facially appears to support the Bureau's position, and we accordingly cannot find that its appeal is wholly frivolous. We therefore deny Licensee's request for counsel fees.

[10] U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants **(Footnote continued on next page…)**

12

Supreme Court of the United States over the past decade concerning chemical testing in the DUI context and its interaction with the Fourth Amendment warrant requirement. (Licensee's Br. at 29-30 (discussing *Missouri v. McNeely*, 569 U.S. 141 (2013), and *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016)).) Licensee stresses a motorist's constitutional right to refuse a *warrantless blood test*, as opposed to a breath test, and contends that any penalty imposed upon that refusal—such as a driver's license suspension—is violative of the unconstitutional conditions doctrine. *Id.* at 32-33. Licensee acknowledges that, in *Commonwealth v. Bell*, 211 A.3d 761 (Pa. 2019), our Supreme Court held that evidence of a motorist's refusal to submit to a warrantless blood draw may be used against the motorist at trial, and such use does not violate the unconstitutional conditions doctrine. Licensee acknowledges that there is little reason to treat driver's license suspensions differently, but he argues that Justice Wecht's dissent in *Bell* provided the correct articulation of the constitutional ramifications of a motorist's decision to invoke his right to refuse an unconstitutional search. *Id.* at 33-34 (discussing *Bell*, 211 A.3d at 787 (Wecht, J., dissenting)). Although the majority opinion in *Bell* is binding as a matter of *federal* constitutional law, Licensee suggests that Justice Wecht's dissenting view could prevail as a matter of Pennsylvania constitutional law under article I, section 8 of the Pennsylvania Constitution.[11]

---

shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

[11] PA. CONST. art. I, §8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.").

Licensee provides this Court with an *Edmunds*[12] analysis in support of that position. *Id.* at 35-45.

## Discussion

### A. Waiver under Pa.R.A.P. 1925(b)

We begin our analysis with Licensee's suggestion that the Bureau has waived all of its issues by filing a defective Concise Statement, for if we agreed with Licensee on this point, such a conclusion would dispose of the entire appeal. Licensee argues that the Bureau's Concise Statement was too long, contained extraneous information, and failed to specifically identify issues raised on appeal. We disagree.

Rule 1925(b)(4) requires a concise statement to comport with the following requirements: (1) to set forth only the errors intended to be asserted on appeal, (2) to concisely identify each error with sufficient detail to allow the judge to identify it, and (3) to specify the issues without redundancy or unnecessary length even if the errors raised are numerous. Pa.R.A.P. 1925(b)(4)(i), (ii), (iv). The purpose of Rule 1925(b) "is to aid appellate review by providing a trial court the opportunity to focus its opinion upon only those issues that the appellant plans to raise on appeal," and it "guarantees predictable consequences for failure to comply with the rule." *Commonwealth v. Castillo*, 888 A.2d 775, 778 (Pa. 2005). Not all lengthy statements pursuant to Rule 1925(b), however, require a finding of waiver or dismissal of the appeal. *Commonwealth v. Vurimindi*, 200 A.3d 1031, 1039 (Pa. Super. 2018).

---

[12] *Commonwealth v. Edmunds*, 586 A.2d 887, 894-906 (Pa. 1991) (discussing independent analysis of the Pennsylvania Constitution, and setting forth factors for courts to consider, including: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case law; (3) related case law from other states; and (4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence).

14

The trial court issued a thorough and detailed opinion in support of its April 6, 2020 order sustaining Licensee's appeal. The Bureau appealed, and on May 19, 2020, was ordered to file its Concise Statement pursuant to Rule 1925(b). On May 28, 2020, the Bureau filed a five-page Concise Statement. (Reproduced Record (R.R.) at 107a-12a.) The Bureau clearly raised the same issues in the Concise Statement that it presently raises on appeal. *Id*. at 109a-11a. On June 15, 2020, the trial court issued a statement pursuant to Rule 1925(a), relying on its April 6, 2020 opinion. (R.R. at 116a.) The trial court stated that it was "constrained to note that upon review of [the Bureau's] rambling, multi-page [Concise Statement], which did not comport with the conciseness requirement of Pa.R.A.P. 1925(b)," it was "appalled by [the Bureau's] attempt to confuse and conflate the procedural issues of this case with the fundamental fact issue of this case . . . ." *Id*.

We differ with the trial court's characterization of the Bureau's Concise Statement. Although longer than what may be necessary, a review of the Bureau's Concise Statement reveals that it is acceptable under Rule 1925(b). We note that the Concise Statement follows the exact issues that were raised and addressed by the trial court in its April 6, 2020 opinion—the same opinion that the trial court felt was satisfactory enough to rely on to address the issues raised in the Bureau's Concise Statement. Even if the Concise Statement was lengthy, the issues were identified without redundancy and the statement was not so incoherent or vague that it was impossible to discern the issues that the Bureau intended to raise.[13]

---

[13] In some instances, lengthy Rule 1925(b) statements have resulted in waiver. *See, e.g.*, *Jiricko v. Geico Insurance Company*, 947 A.2d 206, 214 (Pa. Super. 2008) (finding waiver of issues where the appellant made an incoherent, confusing, redundant, defamatory rant in a lengthy five-page Rule 1925(b) statement); *Tucker v. R.M. Tours*, 939 A.2d 343, 346-48 (Pa. Super. 2007), *aff'd*, 977 A.2d 1170 (Pa. 2009) (finding waiver where the appellants attempted to overwhelm the court by filing a 16-page Rule 1925(b) statement with 76 paragraphs and exhibits). The Bureau's Concise Statement in the instant case, however, does not rise to the level described in cases such as *Jiricko* and *Tucker*.

15

Accordingly, we reject Licensee's suggestion that the Bureau's Concise Statement was so defective as to warrant a finding of waiver, and we proceed to the merits of the Bureau's appeal.

**B. Language Barrier and Chemical Test Refusal**

Turning to the central issue presented in this appeal—the significance of Licensee's language barrier—the analysis implicates an apparent inconsistency in this Court's precedent, which requires clarification. Both the parties and the trial court identify the significant precedents—*Yi* and *Martinovic*. Although the issue in those cases was similar, the decisions reached contrary results. Moreover, there is language in *Martinovic* that appears to be in tension with *Yi*. Due to its factual similarity to these precedents, the instant appeal necessitates our careful consideration of the prior decisions' rationales, the factual predicates of each case, and the extent to which their reasoning comports with the Implied Consent Law and our Supreme Court's pronouncements concerning that law.

Although the relevant line of decisions includes *Im* and *Balthazar*, it is worth noting a significant point of distinction between those cases and the instant case—the trial court's findings of fact in *Im* and *Balthazar* suggested that the licensees in those cases were actually able to comprehend the relevant warnings to an extent that they were able to understand the consequences of refusal, and there was thus no significant language barrier in those cases. *Im* occurred first chronologically. In that case, the licensee, a native Korean speaker, was stopped and subsequently arrested on suspicion of DUI. *Im*, 529 A.2d at 94-95. An officer testified that he advised the licensee six times that if he did not submit to a blood test, his license would be suspended for one year. *Id*. at 95. The officer testified that the licensee was able to understand him when he spoke in English, and that the licensee responded to the officer

16

in English. *Id*. The trial court held that the licensee made a knowing and conscious refusal to take the test because he understood English to a degree necessary to comprehend what he was being asked. *Id*. The trial court "based this finding on the evidence presented and the demeanor" of the licensee as the licensee testified without the assistance of an interpreter. *Id*. This Court affirmed, explaining that the trial judge was the arbiter of credibility and "had a first-hand opportunity to evaluate [the licensee's] ability to understand and respond to questions addressed to him." *Id*. at 95-96. Thus, because the trial judge made the credibility determination that the licensee could understand English, and that the licensee understood the consequences of a refusal, we held that this Court was bound by those determinations. *Id*. at 96.

Two years after *Im*, this Court decided *Balthazar*. In that case, the licensee was arrested for DUI, was asked to submit to a blood test, and refused. *Balthazar*, 553 A.2d at 1054. On appeal, the licensee argued that, as a native Spanish speaker, he did not understand that he was asked to consent to a blood test. *Id*. We noted that the licensee had lived in the United States for 16 years and testified without any indication that he had difficulty comprehending the questions addressed to him. *Id*. We held that based on the facts as found as credible by the trial court, the licensee knowingly and consciously refused the test. *Id*. at 1055.

Next, this Court decided *Yi*. Again, in that case the licensee was arrested on suspicion of DUI. *Yi*, 562 A.2d at 1009. The licensee argued that, due to his language barrier, he did not understand the consequences of refusing the test, and the trial court accepted that explanation as credible. *Id*. Again, we deferred to the trial court's fact-finding. Reviewing the evidence supporting the trial court's finding, we noted:

> This [licensee] testified through an interpreter that he had no
> understanding of the English language and that he did not

17

understand the ramifications of his refusal. He never answered any questions asked without the aid of the interpreter. Furthermore, the arresting officers testified that although they thought the [licensee] might have understood them, they could not be certain. The [trial] court concluded that [the licensee] was unable to understand English and could not make a knowing and conscious refusal. This determination will not be disturbed if it is supported by sufficient evidence. We believe it is. The trial judge had a first-hand opportunity to evaluate the [licensee's] testimony on the stand and, since we find sufficient evidence to support his conclusions, we must uphold his decision.

*Id.* Thus, *Yi* shared *Im*'s and *Balthazar*'s emphasis upon the trial court's findings of fact and determinations of witness credibility. It differed from those cases, though, in that the trial court's findings established a language barrier sufficient to preclude the licensee from making a knowing and conscious refusal.

Then came *Martinovic*. The licensee in that case, a Serbo-Croatian speaker, was arrested for DUI and communicated with the officer in "broken English," but was able to answer all the officer's questions. *Martinovic*, 881 A.2d at 31-32. The officer took the licensee to the booking center and read him the *O'Connell* warnings. *Id*. at 32. No interpreter was available. The officer, using a series of questions and hand signals, asked the licensee whether he would submit to a breath test. *Id*. at 33. The licensee attempted to perform the breath test, but he was unable to complete it successfully. *Id.* The officer explained that there is no protocol if someone suspected of DUI does not speak English, and that he read the warnings only in English. *Id.* The officer, however, felt that the licensee understood every word he was saying to him from the time the vehicle was stopped to the chemical test. *Id.*

At the hearing on the licensee's appeal, the licensee's sister testified that the licensee had never learned English and that she acted as a translator for him. *Id.* She explained that the licensee worked at a warehouse, where he did not need to speak

18

English. *Id.* The licensee also testified through an interpreter that he does not speak English. *Id.* The licensee explained that he recalled his arrest, the police officers explaining something to him, and attempting to take a breath test, but he did not understand what the officers were saying. *Id.* at 34. The trial court ultimately found the licensee's testimony credible and concluded that he did not knowingly and consciously refuse to submit to chemical testing. *Id.*

This Court reversed the trial court's decision. Citing *Yi*, the *Martinovic* Court noted that "some circumstances such as a language barrier might affect a licensee's ability to make a knowing and conscious refusal." *Id.* at 34-35 (citing *Yi*, 562 A.2d 1008). However, the Court stated that "most cases hold that a failure to understand English provides no foundation for an argument that the licensee was unable to make a knowing and conscious refusal." *Id.* at 35. For this latter proposition, the *Martinovic* Court cited *Balthazar* and *Im*. As noted above, however, *Balthazar* and *Im* were cases in which the facts indicated that the licensees *did* understand English. In a footnote, the *Martinovic* Court recognized this conclusion in *Balthazar* and *Im*, and noted that in those cases, the licensees communicated with police officers in English and provided testimony in English. *Id.* at 35 n.7. Curiously, *Martinovic* nonetheless referred to the "the language barrier presented in those cases," which "did not prevent the licensees from making knowing and conscious refusals to submit to chemical testing." *Id.* The *Martinovic* Court did not acknowledge the distinction between those cases—where there was no "failure to understand English" pursuant to the trial courts' findings—and *Yi*—where the trial court did find that a language barrier precluded the licensee's understanding of the arresting officer's warnings.

Despite its recognition of *Yi*'s holding, *Martinovic* went on to state the following:

19

> Although the trial court found that [the licensee] did not speak English sufficiently to have possibly understood the *O'Connell* warnings, whether [the licensee] understands the *O'Connell* warnings or not is inconsequential. An officer's sole duty is to inform motorists of the [I]mplied [C]onsent warnings; once they [sic] have done so, they [sic] have satisfied their [sic] obligation. *Department of Transportation, Bureau of Driver Licensing v. Scott*, [684 A.2d 539 (Pa. 1996)]. Additionally, and not without significance in this case, officers have no duty to make sure that licensees understand the *O'Connell* warnings or the consequences of refusing a chemical test.

*Id.* at 35. *Martinovic* then cited a Superior Court decision for the proposition that police officers have no duty to enlist the assistance of an interpreter to ensure that motorists understand the Implied Consent warnings. *Id.* (citing *Commonwealth v. Robinson*, 834 A.2d 1160, 1164 (Pa. Super. 2003) (reasoning that the provision of interpreters is not required by the Implied Consent Law and is not feasible during DUI investigations)).

Despite these comments, the *Martinovic* Court went on to explain that the refusal in that case was actually based upon the fact that the licensee tried, but failed, to perform a breath test. The Court stated:

> [The licensee] did not "refuse" the test in the ordinary sense of the word, such as explicitly saying "no" to a request to submit to chemical testing or saying anything short of "yes, I will take the test." Instead, **the refusal in this case is predicated on the fact that [the licensee] agreed to take the test and attempted three different times to register a breath sample but *failed to do so***, which is deemed a refusal despite the good faith attempts of the licensee. . . . The record (including the videotape) reveals that [the licensee] took the breathalyzer test based on the physical demonstrations from Agent Mitchem; and Agent Mitchem physically demonstrated to blow harder into the breathalyzer and make a seal with his lips after each failed attempt. [The licensee] attempted to follow Agent Mitchem's instructions each time. Based on these facts, [the licensee] could not have

20

met his burden of proving that his limited understanding of English prevented him from making a knowing and conscious refusal.

*Id.* at 35-36 (bold emphasis added; italicized emphasis in original).

Finally, the *Martinovic* Court rejected the trial court's fact-finding with regard to the licensee's degree of English comprehension. Although the trial court found that the licensee was unable to speak or understand English, this Court emphasized:

> [The licensee] answered all of Officer Hutcheson's questions regarding the vehicle stop, the sobriety tests, and the chemical testing. [The licensee] even answered "yes" on many occasions when asked if he understood what he was being told, and he never communicated—verbally or otherwise—to either Officer Hutcheson or Agent Mitchem that he did not understand what they were telling him regarding the chemical test. Moreover, Officer Hutcheson and Agent Mitchem testified that they had no doubt that [the licensee] understood what they asked of him because of his response to their questions. Most telling of [the licensee's] understanding of the *O'Connell* warnings and the instructions on giving breath samples is the fact that he actually took the chemical test three different times, albeit ultimately yielding insufficient samples. In short, [the licensee] **understood quite enough to make a knowing and conscious refusal of the chemical test** despite his limited understanding of the English language.

*Id.* at 36 n.8 (emphasis added). Accordingly, as a factual matter, *Martinovic* deemed the licensee's comprehension of English to be sufficient to understand the Implied Consent warnings. As such, *Martinovic* is more similar to *Balthazar* and *Im* than it is to *Yi*.

A careful reading of *Martinovic* makes clear that its conclusion regarding the licensee's ability to make a knowing and conscious refusal of a chemical test was

21

premised upon the specific facts presented—the licensee's multiple attempts to complete the test, coupled with the facts that the Court deemed indicative of his ability to comprehend the English language. It follows, then, that *Martinovic*'s broader statement regarding language barriers—that it is "inconsequential" whether a licensee understands the Implied Consent warnings—was not essential to its holding, and may be regarded as *dicta*.

This *dicta*, moreover, is plainly inconsistent with the very purpose of the Implied Consent warnings, as well as our Supreme Court's longstanding pronouncements. *O'Connell*, the seminal decision from which we derive the phrase "*O'Connell* warnings," made quite clear that communication to the licensee of the consequences of refusal is essential. "The law has always required that the police must tell the arrestee of the consequences of a refusal to take the test so that he can make a knowing and conscious choice." *O'Connell*, 555 A.2d at 877. The *O'Connell* Court held that the Implied Consent warnings must include a notice that the licensee's *Miranda* rights are inapplicable in this context, and that a licensee "is entitled to this information so that his choice to take a breathalyzer test can be knowing and conscious . . . ." *Id.* at 878. It is essential that licensees have this information, the *O'Connell* Court stressed, so that they "are not being misled into making uninformed and unknowing decisions to take the test." *Id.*

It is true that the circumstances contemplated in *O'Connell* did not include a language barrier precluding a licensee's understanding of the warnings provided in English. Regardless, there is clear tension between these straightforward pronouncements and *Martinovic*'s suggestion that "whether [the licensee] understands the *O'Connell* warnings or not is inconsequential." *Martinovic*, 881 A.2d at 35. Indeed, it is difficult to imagine how licensees who do not understand the warnings

22

could be said to provide "knowing and conscious" refusals within the meaning of *O'Connell*. Having no comprehension of the words spoken to them, it seems obvious that such licensees will be "misled into making uninformed and unknowing decisions" as to whether to submit to testing. *O'Connell*, 555 A.2d at 878. Nonetheless, *Martinovic*'s *dicta* approves of a scenario in which a police officer, who is fully aware that a licensee does not understand any of the words spoken to him in English, simply reads the words on the DL-26B Form, and, recognizing that the licensee does not comprehend, nonetheless deems the licensee's subsequent refusal to be "knowing and conscious." To justify this suggestion, *Martinovic* cited our Supreme Court's decision in *Scott* for the proposition that a police officer's sole duty is to read the words on the form, and that the officer has no duty to ensure that the licensee understands them. *Martinovic*, 881 A.2d at 35 (citing *Scott*, 684 A.2d 539). However, a straightforward reading of *Scott* belies *Martinovic*'s suggestion that comprehension of the warnings is inconsequential.

    *Scott* concerned a situation where a licensee, although he had been provided *O'Connell* warnings that informed him that he did not have *Miranda* rights with regard to the chemical test, "refused to believe the substance of the *O'Connell* warnings." *Scott*, 684 A.2d at 543. The licensee did not believe that he could be denied an opportunity to consult with an attorney before deciding whether he would submit to the test. Our Supreme Court emphasized that, once the Bureau meets its initial evidentiary burden in a license suspension case, but a licensee asserts that his refusal was not knowing and conscious, it is the licensee's burden to establish that he was "*not capable*[] of making a knowing and conscious refusal to take the test." *Id.* (quoting *O'Connell*, 555 A.2d at 876) (emphasis in original). But, the *Scott* Court held, "[r]efusing to believe the substance of the *O'Connell* warnings as given does not render

23

the motorist *incapable* of making a knowing and conscious decision regarding chemical testing." *Id.* (emphasis in original). A licensee is "incapable of making a knowing and conscious refusal," the *Scott* Court stressed, "when he is unaware that his right to remain silent and his right to consult with an attorney are not applicable to the provisions of the Implied Consent Law." *Id.* (citing *O'Connell*, 555 A.2d at 877). The Supreme Court repeatedly emphasized that the *capability* of the licensee to make a knowing and conscious choice is tied to the licensee's *awareness* of the content of the *O'Connell* warnings. Plainly, the implication is that a licensee who is unaware of the substance of the warnings—one who, *e.g.*, does not understand the warnings read only in English—may not be *capable* of making a knowing and conscious choice as to whether to submit to a chemical test.

This was only the beginning of the *Scott* Court's emphasis upon the importance of the licensee's understanding. *Scott* ultimately resolved a lingering uncertainty as to when exactly *O'Connell* warnings must be given. Explaining its holding, the *Scott* Court stated:

> Thus, we now hold, whenever a motorist has been requested to submit to chemical sobriety testing the motorist must be provided *O'Connell* warnings regardless of whether *Miranda* warnings have been given, and, regardless of whether the motorist exhibits confusion concerning his rights when asked to submit to chemical sobriety testing.
>
> Once an officer provides *O'Connell* warnings to a motorist, the officer has done all that is legally required to ensure that the motorist has been fully advised of the consequences of refusing to submit to chemical testing. By requiring the officer to advise the motorist that his *Miranda* rights are not applicable to the request to submit to chemical sobriety testing, the officer can be assured that he has done **everything possible to assist the motorist in making an informed decision consistent with that motorist's rights** as articulated by the Constitution and by the Implied Consent

24

Law. Placing this additional burden on law enforcement in order to attempt to **insure that a motorist is making a knowledgeable and informed decision** is certainly reasonable and justified given the potential for confusion in circumstances such as these. Furthermore, the additional burden of requiring *O'Connell* [w]arnings, whenever an officer requests a motorist to submit to chemical testing, is minor when balanced against the **obvious need to verify that the motorist is fully aware of his rights and responsibilities when being asked to submit to the testing**.

*Id.* at 545-46 (emphasis added).

The *Martinovic dicta*, however, focused exclusively upon one sentence in *Scott*—that "[o]nce an officer provides *O'Connell* warnings to a motorist, the officer has done all that is legally required to ensure that the motorist has been fully advised of the consequences of refusing to submit to chemical testing." *Id.* at 546; *see Martinovic*, 881 A.2d at 35. However, the *Martinovic dicta* divorced this sentence from its context. Read against its facts, the *Scott* Court's comment about the police officer's duty meant that the officer is not required to confirm that the licensee subjectively *believes* the substance of the *O'Connell* warnings. The *Martinovic dicta* disregarded the *Scott* Court's repeated emphasis upon the need for the licensee to make a "knowledgeable and informed decision," and its stress upon the "obvious need to verify that the motorist is fully aware of his rights and responsibilities when being asked to submit to the testing." *Scott*, 684 A.2d at 546.

Nowhere in *Scott* is there any suggestion that it is "inconsequential" whether the licensee understands his rights and responsibilities with respect to chemical testing. *Martinovic*, 881 A.2d at 35. Indeed, the suggestion runs counter to the very purpose of the warnings, the analyses in *O'Connell* and *Scott*, and the common

25

understanding of what it means to make a "knowing and conscious" choice.[14]  As such, while we reiterate that the relevant language in *Martinovic* constitutes *dicta* and is not binding, for the sake of clarifying our case law and resolving the apparent tension between *Martinovic* and *Yi*, we disapprove of *Martinovic*'s comments regarding the significance, or lack thereof, of language barriers in this context.[15]

Returning to *Yi*, we note that the instant case bears a significant similarity to that case.  In both *Yi* and the instant case, the licensees testified entirely through an interpreter, testified that they did not understand English, and never answered any questions asked in English, at least not without the aid of Officer O'Connor's hand

---

[14] Although not concerning a language barrier, our Supreme Court's decision in *Commonwealth v. Myers*, 164 A.3d 1162 (Pa. 2017), is also instructive.  Although it is a plurality decision with respect to a constitutional issue concerning implied consent, a majority of the Justices in *Myers* agreed that an unconscious arrestee was unable to make a knowing and conscious choice to submit to a chemical test, and a police officer's reading of *O'Connell* warnings to the unconscious arrestee was a nullity.  *See id.* at 1181 ("Because Myers was pharmacologically rendered unconscious by medical personnel prior to the time that Officer Domenic read [the] *O'Connell* warnings to his unresponsive arrestee, no credible assertion can be made that Myers was provided with the opportunity to make a 'knowing and conscious choice' regarding whether to undergo chemical testing or to exercise his right of refusal.") (citing *O'Connell*, 555 A.2d at 877); *see also id.* at 1184 (Todd, J., concurring).  Although Licensee's language barrier here does not raise precisely the same issue as the arrestee's unconsciousness in that case, *Myers* offers further support for the proposition that an inability to understand the Implied Consent warnings deprives an individual of the opportunity to make a knowing and conscious choice as to whether to submit to chemical testing.

[15] The Concurrence expresses concern that we have conflated the Bureau's evidentiary burden with the Licensee's burden, upon satisfaction of the former, to demonstrate that his refusal was not knowing and conscious.  We have done no such thing.  As noted above, there is no dispute that the Bureau satisfied its initial burden to establish the grounds for suspension of Licensee's operating privilege; the question here is whether Licensee is able, as a matter of law, to establish that his refusal was not knowing and conscious due to his inability to understand the Implied Consent warnings read to him in English.  *See supra* note 8.  While the Concurrence suggests that we have gone too far in disapproving of the *Martinovic dicta*, it bears repeating that the Bureau's express argument to this Court is that, based upon that language in *Martinovic*, it is inconsequential whether Licensee was able to comprehend the warnings.  In order to demonstrate the flaw in the Bureau's legal argument, and for the sake of clarifying the obvious inconsistency in our case law that *Martinovic* has created, it is necessary to address, and reject, *Martinovic*'s broad statements in *dicta* concerning language barriers.

26

signals in the instant case. *Yi*, 562 A.2d at 1009; Trial Ct. Op. at 11. In both *Yi* and the instant case, moreover, the arresting officers expressed uncertainty as to whether the licensees understood their warnings and instructions given in English. Perhaps most importantly, in both *Yi* and the instant case, the trial courts made findings of fact that the licensees were unable to comprehend English to an extent that they did not understand the consequences of refusal. As in *Yi*, we find that the trial court's findings concerning Licensee's English comprehension are supported by the evidence described above, and that there was no error in the trial court's conclusion that Licensee was unable to understand the consequences of his refusal to submit to a chemical test, and that he therefore was not capable of making a knowing and conscious choice. Because the Bureau's argument to the contrary is based entirely upon *Martinovic*, the relevant passage of which both constitutes *dicta* and does not reflect an accurate statement of the law, we find no merit in the Bureau's position.

### C. The Bureau's Remaining Arguments

Beyond its assertion of legal error based upon the *Martinovic dicta*, the Bureau advances several challenges to the trial court's fact-finding and, therefore, the conclusion that it drew from those facts. None of the Bureau's arguments are meritorious. The Bureau contends that the trial court's finding regarding Licensee's English comprehension was not supported by substantial evidence. First, it questions the trial court's reliance upon Officer O'Connor's testimony that he was *uncertain* as to whether Licensee understood him when he read the DL-26B Form. (Bureau's Br. at 23; Trial Ct. Op. at 5.) However, the Bureau's argument on this point is intertwined with its reliance upon *Martinovic*, as the Bureau contends that Officer O'Connor's uncertainty was immaterial because his only duty was to read the form, regardless of

whether Licensee understood its contents. As we already have rejected the Bureau's position in this regard, we need not reiterate the deficiencies in the *Martinovic dicta*.

To the extent that the Bureau suggests that the trial court's findings were not supported by substantial evidence due to its citation of Officer O'Connor's testimony, we note that the trial court expressly relied upon Licensee's testimony that he was unable to understand English. (Trial Ct. Op. at 6, 11 (citing N.T. at 18-20).) This alone is substantial evidence supporting the trial court's finding. Moreover, the trial court relied upon the fact that Licensee testified only through a translator, that he did not answer any questions in English, that he appeared to understand Officer O'Connor's instructions only when aided by hand signals, and that the language barrier was so apparent that Officer O'Connor attempted to obtain the assistance of a Spanish-speaking officer. *Id.* at 11-12. All of this evidence amply supported the trial court's finding regarding Licensee's "lack of understanding of the English language," which the trial court characterized as "undeniable." *Id.* at 11.

Next, the Bureau stresses Licensee's testimony that he *did not recall* being warned that his operating privilege would be suspended if he refused the chemical test, which the Bureau attempts to portray as a contradiction with Licensee's testimony that he *did not understand* the warnings in English. (Bureau's Br. at 27-28.) According to the Bureau, this ostensible conflict undercuts Licensee's assertion that he did not understand English. This argument is meritless for multiple reasons. First, it is beyond cavil that "resolution of questions of evidentiary weight and conflicts in the testimony is solely in the province of the trial court." *Renfroe v. Department of Transportation, Bureau of Driver Licensing*, 179 A.3d 644, 651 (Pa. Cmwlth. 2018) (*en banc*). Even if the Bureau had identified a conflict in Licensee's testimony, this would not present a basis to disturb the trial court's fact-finding. Such would be an issue concerning the

28

weight of the evidence, not its competence. However, more fundamentally, the Bureau's point is flawed because there is no conflict whatsoever in Licensee testifying that he simultaneously "did not recall" and "did not understand" Officer O'Connor's warnings. Licensee first would have to "understand" the content of the warnings in order to later "recall" them. Plainly, no one will recall the substance of a question asked of him in a language that he does not speak.

In a similar vein, the Bureau contends that Licensee failed to meet his burden because he did not present evidence demonstrating that his intoxication was not a factor in his inability to understand Officer O'Connor's warnings, and that he should have presented evidence concerning his lack of comprehension of English while sober. (Bureau's Br. at 29-30.) This argument likewise misses the mark. The authorities that the Bureau cites rejected the contention that voluntary intoxication could serve as the basis for the conclusion that a refusal was not knowing and conscious, which Licensee does not suggest. Rather, Licensee argues that his language barrier was the issue. As to whether Licensee was capable of understanding English when he is sober, we note again that the trial court relied upon Licensee's testimony that he does not understand English—testimony that Licensee gave through an interpreter during a court hearing in which, presumably, he was sober. The trial court was free to credit this testimony. Contrary to the Bureau's suggestion, it is nonsensical to conclude that the influence of alcohol would hinder Licensee's ability to comprehend a language that he does not speak in the first place.

Accordingly, we reject all of the Bureau's challenges to the trial court's fact-finding, as each amounts to a mere challenge to the weight of the evidence, rather than its competence. The trial court's finding regarding Licensee's lack of

29

comprehension of the English language was amply supported by substantial evidence, and the Bureau presents no basis to disturb that finding.

**Conclusion**

In sum, we conclude that the trial court's findings of fact were supported by substantial evidence, and that the conclusions that the trial court drew from those findings were free from legal error. Licensee's inability to understand Officer O'Connor as he read the DL-26B Form in English prevented Licensee from understanding the consequences of his refusal to submit to chemical testing. "The law has always required that the police must tell the arrestee of the consequences of a refusal to take the test so that he can make a knowing and conscious choice." *O'Connell*, 555 A.2d at 877. To the extent that *Martinovic* suggests that it is "inconsequential" whether a licensee understands those consequences, *Martinovic*, 881 A.2d at 35, we regard this language as *dicta*, and conclude that it is not consistent with applicable precedent.

We recognize that circumstances such as those presented in the instant case present a challenge for law enforcement personnel, and that it is impossible for police departments to have officers who speak many different languages on duty at all times. We also do not suggest that the provision of human interpreters on demand is a legal necessity, or even a possibility. However, because we may not disregard the need to provide motorists with the ability to make a knowing and conscious choice to submit to a chemical test, it would be prudent for the Bureau to develop a solution to the problem presented by these cases.[16] Until such a time as the Bureau develops such a

---

[16] Notably, the advancements in technology available today may provide options that were not available in the past. The trial court in this case hinted at such a possibility, noting:

**(Footnote continued on next page…)**

solution, our duty is simply to uphold the determination of the trial court where its finding of an insurmountable language barrier is supported by substantial evidence.

The order of the trial court is affirmed.[17]

_____
PATRICIA A. McCULLOUGH, Judge

> Although recent technological inventions appear to have produced a hand-held multi-language translating device, which, if properly programmed, may begin to bridge this chasm between the verbal directives of an English-speaking officer and a non-English speaking motorist, no such technology is presently being utilized in Dauphin County to our knowledge.

(Trial Ct. Op. at 13.) Although the trial court's suggestion may provide one potential solution to the challenges presented here, there are other possibilities which would not necessitate instant, digital translation. For instance, the Bureau could translate the DL-26B Form into multiple languages, and perhaps prepare an audio recording of its contents being read aloud in each such language.

[17] Because we conclude that each of the Bureau's arguments fails on the merits, we need not address Licensee's alternative argument regarding the constitutionality of the Implied Consent Law as it concerns the refusal to submit to a warrantless blood test.

31

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Isak Vazquez-Santiago      :
                             :   No. 453 C.D. 2020
             v.             :
                             :
Commonwealth of Pennsylvania,    :
Department of Transportation,     :
Bureau of Driver Licensing,       :
                Appellant    :

## ***ORDER***

AND NOW, this 4th day of January, 2022, the April 6, 2020 order of the Court of Common Pleas of Dauphin County is AFFIRMED.

 

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Isak Vazquez-Santiago       :
                                 :
         v.                :
                                 :
Commonwealth of Pennsylvania,  :
Department of Transportation,   :
Bureau of Driver Licensing,     :   No. 453 C.D. 2020
            Appellant     :   Argued: October 20, 2021

BEFORE:   HONORABLE P. KEVIN BROBSON, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE J. ANDREW CROMPTON, Judge

CONCURRING OPINION
BY JUDGE COVEY                       FILED: January 4, 2022

While I agree that the Dauphin County Common Pleas Court's (trial court) April 6, 2020 order that sustained Isak Vazquez-Santiago's (Licensee) appeal should be affirmed, I write separately out of concern that the Majority Opinion may have unintended results.[1] Specifically, I am troubled that the Majority opinion appears to conflate a licensee's burden and the Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing's (DOT) burden and, thus, may place an undue burden on police officers, and open the door for chemical testing refusals based on a police officer's failure to do something beyond that which he is required.

Section 1547(b)(2) of the Vehicle Code, commonly known as the Implied Consent Law, expressly states:

---

[1] I also agree that the Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing's (DOT) Concise Statement of Errors Complained of on Appeal was not defective, and DOT did not waive its issues.

It shall be the duty of the police officer to inform the person that:

(i) the person's operating privilege will be suspended upon refusal to submit to chemical testing and the person will be subject to a restoration fee of up to $2,000[.00]; and

(ii) if the person refuses to submit to chemical breath testing, upon conviction or plea for violating [S]ection 3802(a)(1) [of the Vehicle Code[, 75 Pa.C.S. § 3802(a)(1)] (relating to driving under the influence (DUI)], the person will be subject to the penalties provided in [S]ection 3804(c) [of the Vehicle Code, 75 Pa.C.S. § 3804(c)] (relating to penalties).

75 Pa.C.S. § 1547(b)(2).

The law is well settled that,

[t]o support the suspension of a licensee's operating privilege under the Implied Consent Law, **DOT must prove that the licensee**: (1) was arrested for DUI by an officer who had reasonable grounds to believe that the licensee was operating a vehicle while under the influence of alcohol in violation of Section 3802 of the Vehicle Code; (2) was asked to submit to a chemical test; (3) refused to do so; and (4) **was warned that his refusal might result in a license suspension and would result in enhanced penalties if he were** [sic] **later convicted of DUI**. Once DOT satisfies its burden of proof, **the burden shifts to the licensee to prove that** either: (1) **his refusal was not knowing and conscious**; or (2) he was physically incapable of completing the chemical test.

*Conrad v. Dep't of Transp., Bureau of Driver Licensing*, 226 A.3d 1045, 1051 (Pa. Cmwlth. 2020) (emphasis added; citation omitted). I believe the Majority, by disapproving the *Martinovic v. Department of Transportation, Bureau of Driver Licensing*, 881 A.2d 30 (Pa. Cmwlth. 2005), comments regarding language barriers in this context, is arguably placing the burden on DOT to prove that the licensee gave a knowing and conscious refusal, rather than placing the burden on the licensee to prove that it was not knowing and conscious, which is the current state of the law.

Here, the trial court found that Licensee met his burden. The trial court opined:

> In conclusion, th[e trial c]ourt is bound by the dictate that a refusal of chemical testing must be knowing and conscious in order for a license suspension to be upheld. We acknowledge that **the mere proclamation of a language barrier alone is insufficient for a licensee to meet his burden of establishing that his refusal was not knowing or conscious** and that additional facts or evidence can infer a knowing or conscious refusal in spite of a licensee's purported language barrier. However, no such additional facts or evidence have been set forth in this matter to contradict [Licensee's] clear lack of understanding of the English language, and, therefore, we find that [Licensee's] appeal must be SUSTAINED, and the suspension of his driving privileges must be RESCINDED.[FN]4
>
> > [FN]4 Although we find, upon consideration of the foregoing discussion, that [Licensee] did not knowingly and consciously refuse [Harrisburg City Police] Officer [Carson] O'Connor's [(Officer O'Connor)] request for chemical testing, we find it suitable to emphasize that this [o]pinion in no way is intended to be a criticism of [] Officer [O'Connor]'s actions during the traffic stop and the events that occurred immediately subsequent thereto. In fact, **Officer O'Connor did all that was required of him under the circumstances**. *Martinovic*, 881 A.2d at 35 (noting that while the [I]implied [C]onsent [L]aw imposes a duty on the police officer to apprise a motorist of the consequences of chemical test refusal, **the officer has no duty to make certain that the motorist understands said consequences**). Likewise, we recognize the dictate of our courts that **it is not an officer's duty to enlist the assistance of an interpreter to make sure a motorist understands implied consent warnings** (*O'Connell*[2] **Warnings**), **nor is it feasible to do so**. *Id.* (citing *Commonwealth v. Robinson*, 834 A.2d 1160, 1164 (Pa. Super. 2003)). However, th[e trial c]ourt is bound by the concomitant principle that a

---

2 *Dep't of Transp., Bureau of Traffic Safety v. O'Connell*, 555 A.2d 873 (Pa. 1989).

> refusal of chemical testing must be knowing and conscious in order for a license suspension to be upheld. There being no scintilla of evidence to infer that [Licensee] understood the consequences of his chemical test refusal in light of his complete inability to understand the English language, th[e trial c]ourt finds that it is bound to rescind [Licensee's] license suspension regardless of the appropriateness of Officer O'Connor's actions surrounding the traffic stop and attempted blood draw.

Trial Ct. Op. at 14-15 (italics and emphasis added).

Because I agree with the trial court that Licensee met his burden of proving that his refusal was not knowing and conscious, I join in affirming the trial court's order. Indeed, the trial court's reasoning is so on point and in line with this Court's applicable case law, I question the Majority's need to go as far as it did in reaching its conclusion that the trial court's order should be affirmed. Accordingly, because I am concerned that the Majority may have blurred the lines between DOT's burden to show that a police officer warned a licensee of the consequences of the licensee's refusal to submit to chemical testing, and the licensee's burden to prove his refusal was not knowing and conscious, I concur in the result only.

_____
ANNE E. COVEY, Judge